11:59:45  1    Development Council.

11:59:50  2        Q.   Okay.   And that report was not generated by

11:59:54  3    Titan, was it?

11:59:57  4        A.   No.

11:59:59  5        Q.   It was a report generated by BEDC?

12:00:02  6        A.   Yes.

12:00:05  7        Q.   Okay.   What was that report about?   Did it have

12:00:11  8    a particular topic?   You know, like letters have a

12:00:16  9    "re:" line.   Did it have something like that?

12:00:18  10       A.   You asked me for an example.   I gave you an

12:00:20  11   example of how I might look at documentary information.

12:00:23  12   I cannot recall at this point a particular specific

12:00:30  13   report.   You're talking about some specific report.

12:00:33  14       Q.   Okay.   So that's a possibility, but you can't

12:00:36  15   say one way or another whether that happened.   You

12:00:39  16   can't say it happened or it didn't happen.   It's just a

12:00:41  17   possibility.

12:00:41  18       A.   I believe that it did happen.   I believe I

12:00:43  19   looked at documentation from BEDC.

12:01:12  20       Q.   In your tenure as president of GBIC, have you

12:01:19  21   done more project agreements similar to the one with

12:01:27  22   Titan?   And I'll be specific about "similar."

12:01:29  23            Have you done project agreements where

12:01:32  24   GBIC provided an incentive package for a company to

12:01:35  25   come to Brownsville or the surrounding area?

12:01:37 1    A.    Yes.

12:01:41 2    Q.    Okay.    About how many have you done as

12:01:44 3    president?    I'm not asking for a specific number.

12:01:50 4    A.    More than 3, less than 12.

12:01:55 5    Q.    A pretty good range.    Have you -- in your

12:02:08 6    experience, when a company builds a 20-million-dollar

12:02:14 7    facility, do they generally finance it, or do they

12:02:17 8    generally pay for it out of their pocket?

12:02:20 9    A.    I have no idea.

12:02:43 10    Q.    The 3 to 12 projects you've done as president,

12:02:48 11    were they -- on a relative order of magnitude, were

12:02:52 12    they similar size?    Smaller?    Bigger?

12:02:56 13    A.    Smaller.

12:03:11 14    Q.    In your experience, have you ever heard of any

12:03:15 15    companies who build a 20-million-dollar plant who pay

12:03:19 16    for it out of their pocket?

12:03:21 17    A.    No.

12:03:23 18    Q.    Have you heard of any who finance it?

12:03:27 19    A.    No.    Outside of this contract.

12:03:40 20    Q.    Yeah.    I'm being broad.

12:03:47 21    Did you ever -- did there ever come a time

12:03:50 22    when you became aware that Titan had entered into an

12:03:53 23    arrangement with GE Capital?

12:03:55 24    A.    Yes.

12:03:56 25    Q.    When did you become aware of that?

12:03:58  1        A.   Some time prior to signing my affidavit.

12:04:17  2        Q.   Which you did on the 9th of July; is that

          3   correct?

12:04:21  4        A.   Yes.

12:04:26  5        Q.   Do you know the source of that information?  Do

12:04:29  6   you know how you found that out?

12:04:35  7        A.   Within a range, the answer is yes.

12:04:43  8        Q.   Okay.  What would be the source of that

12:04:45  9   information?

12:04:46 10        A.   Conversations with GBIC board members, BEDC,

12:04:54 11   and documentation from BEDC or GBIC.

12:05:03 12        Q.   So documentation from either one?

12:05:05 13        A.   Yes.

12:05:08 14        Q.   What kind of documentation, if you remember?

12:05:11 15        A.   I don't recall.

12:05:16 16        Q.   Do you remember who may have had that

12:05:21 17   documentation and showed it to you?

12:05:23 18        A.   I don't.

12:05:27 19        Q.   Okay.  Would this be a type of documentation

12:05:29 20   that's kept in GBIC files?

12:05:37 21        A.   I don't know.

12:05:40 22             MR. NICOLAS:  Let's go off the record.

          23             (Brief discussion off the record)

12:06:45 24        Q.   With regard to any documentation of the GE

12:06:51 25   Capital arrangement with Titan, have you seen any

12:06:55  1    documentation that was created by GBIC?  Memos?

12:07:12  2    Letters?

12:07:12  3        A.  I don't know.

12:07:14  4        Q.  Same question with respect to BEDC.

12:07:21  5        A.  I don't know.

12:07:41  6        Q.  Okay.  You mentioned conversations with GBIC

12:07:45  7    board members as a possible source of that information

12:07:49  8    regarding the GE Capital arrangement.

12:07:52  9             Do you know which GBIC board members you

12:07:56 10    may have spoken with?

12:08:00 11        A.  Not specifically.

12:08:02 12        Q.  Would those be discussions inside or outside of

12:08:06 13    meeting?

12:08:15 14        A.  I don't recall.

12:08:19 15        Q.  Okay.  Has this arrangement -- the GE Capital

12:08:22 16    arrangement with Titan, has that ever been discussed in

12:08:25 17    the GBIC board meetings?

12:08:28 18        A.  I believe so.

12:08:30 19        Q.  And what would those discussions be about?

12:08:46 20        A.  The fact that there was such an arrangement.

12:08:51 21        Q.  Do you recall approximately when those

12:08:56 22    discussions may have taken place?

12:09:06 23        A.  Prior to my becoming president, but I can't be

12:09:11 24    more specific than that.

12:09:12 25        Q.  I think there may be a little confusion.  Did

12:09:19　1　you attend GBIC board meetings prior to becoming

12:09:23　2　president?

12:09:24　3　　　A.　Yes.

12:09:24　4　　　Q.　Okay.  So that's how you -- okay.  That's how

12:09:26　5　you heard -- sorry.  I didn't eat breakfast either.

12:09:31　6　　　　　　So when you attended GBIC board meetings

12:09:34　7　prior to becoming president, that's when you may have

12:09:37　8　heard the discussions at the meeting -- at the board

12:09:40　9　meeting.

12:09:41　10　　　A.　When I may have first heard it.

12:10:04　11　　　Q.　Okay.  I talked about this a little bit with

12:10:06　12　Mr. Hilts this morning.

12:10:07　13　　　　　　Have you heard anything about Titan

12:10:11　14　marketing to sell the facility on Paredes Line?

12:10:15　15　　　A.　Yes.

12:10:16　16　　　Q.　From whom?

12:10:23　17　　　A.　Hilts.

12:10:24　18　　　Q.　Anyone else?

12:10:34　19　　　A.　Not that I recall.

12:10:45　20　　　Q.　Okay.  Have any potential buyers contacted you?

12:10:45　21　　　A.　No.

12:10:45　22　　　Q.　Okay.  Have any realtors contacted you?

12:10:46　23　　　A.　No.

12:10:48　24　　　Q.　Site developers?

12:10:49　25　　　A.　No.

12:10:50  1      Q.  Basically, as you sit here, Mr. Hilts is the

12:10:58  2  only one you can recall that talked to you about that?

12:11:01  3      A.  He was the first.

12:11:03  4      Q.  He was the first.  And do you remember anybody

12:11:07  5  who may have spoken to you about it after him?  "First"

12:11:11  6  implies that there are more is why I'm asking.

12:11:14  7      A.  Conversations, but no more information, just

12:11:20  8  embellishment of the fact, examination of the fact.

12:11:24  9      Q.  Okay.  So when you say "examination of the

12:11:27 10  fact," did you investigate further what Mr. Hilts had

12:11:30 11  told you?

12:11:31 12      A.  No.

12:11:35 13      Q.  Okay.  What exactly did Mr. Hilts tell you was

12:11:39 14  happening?

12:11:40 15      A.  As I recall, that it was his understanding or

12:11:50 16  knowledge that he was made aware or became aware that

12:11:59 17  the property was being marketed.

12:12:11 18      Q.  Okay.  I'm going to use "personal knowledge"

12:12:14 19  again.  I'll try to be more specific this time.

12:12:17 20          Do you have any personal knowledge of

12:12:19 21  Titan marketing the plant?  By that, I mean, have you

12:12:23 22  been party to any negotiations?  Have you --

12:12:27 23      A.  No.

12:12:28 24      Q.  -- talked to anybody who says they were a buyer

12:12:30 25  or a potential buyer?

12:12:31 1      A.  No.

12:12:32 2      Q.  Have you talked to anybody who says that they

12:12:34 3  are a broker or a go-between?

12:12:36 4      A.  No.

12:12:38 5      Q.  So you don't have any personal knowledge of

12:12:43 6  either the marketing or the purchasing of the facility

12:12:51 7  right now?

12:12:58 8      A.  I object to that word "personal."  I do have

12:13:01 9  personal knowledge if I accept your word that the light

12:13:05 10  is on.  I have personal knowledge if I believe what you

12:13:11 11  say.  That to me is personal knowledge.  Do I have

12:13:16 12  direct knowledge?

12:13:17 13      Q.  Okay.  Let's use your term "direct knowledge."

12:13:20 14  Do you have any direct knowledge?

12:13:21 15      A.  Not other than what I've been told.

12:13:24 16      Q.  So the only thing you know is what people have

12:13:26 17  told you and you believe as opposed to what you have

12:13:28 18  seen, touched, felt, heard?

12:13:32 19      A.  Yes.

12:13:34 20      Q.  Okay.  I think that's the difference between

12:13:37 21  personal and nonpersonal knowledge.

12:13:52 22          So is it fair to say that other than these

12:13:56 23  rumors, you have no documentary evidence of any

12:13:59 24  marketing of the plant?

12:14:03 25      A.  Can you repeat that question?

12:14:05  1      Q.  Sure.  Is it fair to say that other than

12:14:07  2    rumors, you don't have any documentation of an

12:14:11  3    attempted sale of the plant?

12:14:12  4      A.  I don't understand the question.

12:14:16  5      Q.  We'll move on.

12:14:21  6              To your knowledge, do either GBIC or BEDC

12:14:24  7    have a prospective company or business to use the Titan

12:14:30  8    facility?

12:14:30  9      A.  No.

12:14:31 10      Q.  To your knowledge, have either BEDC or GBIC

12:14:35 11    been contacted by a prospective business to use the

12:14:38 12    Titan facility?

12:14:38 13      A.  No.

12:14:41 14      Q.  Have either GBIC or -- I think I know the

12:14:43 15    answer to this question, but have either GBIC or BEDC

12:14:47 16    solicited business to use the Titan facility?

12:14:50 17      A.  Not to my knowledge.

12:14:55 18      Q.  Have either BEDC or GBIC entered into any

12:14:58 19    agreement memorandum of understanding or letter of

12:15:01 20    intent with any company regarding the Titan facility?

12:15:03 21      A.  Not to my knowledge.

12:15:07 22      Q.  As president of GBIC, would you be the one to

12:15:11 23    have knowledge of those things?

12:15:14 24      A.  Yes.

12:15:16 25      Q.  So GBIC can't enter into a memoranda of

12:15:20  1    understanding without you knowing about it.

12:15:22  2        A.   Correct.

12:15:35  3        Q.   And BEDC can't enter into any memoranda of

12:15:42  4    understanding or agreement with respect to that

12:15:45  5    property without consulting GBIC; is that correct?

12:15:56  6        A.   It's difficult to answer that, memoranda of

12:16:01  7    understanding.  Certainly BEDC could not commit.  Some

12:16:08  8    intention could be set forth.  Some letter of

12:16:12  9    understanding of intentions perhaps before bringing it

12:16:16  10   or making a presentation to GBIC might be possible, but

12:16:23  11   certainly nothing could be committed.  They are not the

12:16:27  12   committers.

12:16:29  13       Q.   Sure.  Might an easy distinction be that they

12:16:32  14   can make proposals but they can't enter into the

12:16:35  15   contract?

12:16:35  16       A.   Correct.

12:17:30  17       Q.   Okay.  I've marked as Exhibit 4 to your

12:17:32  18   deposition plaintiff's response to defendant's request

12:17:34  19   for production.  Have you ever seen this document

12:17:52  20   before?

12:17:58  21       A.   I don't recall.

12:18:03  22       Q.   Were you ever asked to search for documents

12:18:07  23   that may be responsive to defendant's request for

12:18:10  24   production?

12:18:10  25       A.   No.

12:18:11  1      Q.  Do you know if anyone on GBIC staff was asked

12:18:19  2  to search for documents that are responsive to

12:18:22  3  defendant's request for production?

12:18:23  4      A.  No.

12:18:24  5      Q.  Is there a particular person who would be the

12:18:27  6  contact person for that type of record search?

12:18:32  7      A.  Brian Janis.

12:18:36  8      Q.  That makes it easy, doesn't it?

12:18:38  9          MR. JANIS:  There's no staff, by the way,

12:18:40 10  of GBIC.

12:18:41 11          MR. NICOLAS:  Okay.

12:18:47 12      Q.  Where are GBIC's records kept?  I guess the

12:18:53 13  first question would be, does GBIC keep records?

12:19:05 14      A.  Yes.

12:19:08 15      Q.  And where would they keep those records?

12:19:13 16      A.  To my knowledge, in either of two places.

12:19:15 17      Q.  Okay.

12:19:16 18      A.  Either with Brian Janis or with the City.

12:19:23 19      Q.  Okay.  When you say "with the City," do you

12:19:27 20  mean documents that are actually filed with the City,

12:19:30 21  or do you mean that the documents are kept in a filing

12:19:34 22  cabinet at the City?  Do you understand the

12:19:36 23  distinction?

12:19:36 24      A.  The City is also contracted for its

12:19:44 25  administrative and record keeping -- I don't know what

12:19:47  1    the name of it is -- services --

12:19:50  2        Q.   Sure.

12:19:50  3        A.   -- to GBIC.

12:19:53  4        Q.   Okay.

12:19:54  5        A.   Or by GBIC.

12:19:56  6        Q.   Is it GBIC's regular practice to maintain

12:20:04  7    correspondence between it and prospective businesses

12:20:07  8    and businesses it brings to the community?

12:20:10  9        A.   No.

12:20:11 10        Q.   So those records are not maintained?

12:20:14 11        A.   Repeat that.

12:20:16 12        Q.   The first question or the second -- the last

12:20:18 13    one?

12:20:18 14        A.   The first one, because I didn't understand the

12:20:20 15    second one after you asked the first one.

12:20:24 16        Q.   Okay.  Is it GBIC's practice to keep

12:20:29 17    correspondence between itself -- between GBIC and

12:20:36 18    prospective businesses that are coming into the

12:20:39 19    community?

12:20:41 20        A.   No.

12:20:46 21        Q.   Okay.

12:20:47 22             MR. JANIS:  If I could maybe help clarify.

12:20:49 23             MR. NICOLAS:  I'm fine.

12:20:51 24        Q.   Does GBIC have a document retention policy?

12:20:56 25        A.   No, not that I know of.

12:20:58 1     Q.   That's fine.

12:21:01 2          MR. JANIS:  The City -- this might help

12:21:03 3 you along.  The City has a contract with GBIC.  It

12:21:08 4 keeps it records and runs its finance.  That's all in

12:21:12 5 the Open Records Act.

12:21:14 6          The only communications there are are

12:21:15 7 minutes, contracts, you know, things that are done by

12:21:17 8 the board action.  And what you're asking about in

12:21:21 9 terms of contacts of prospects, that's handled under

12:21:24 10 the contract of BEDC.  BEDC is the agent that goes out

12:21:28 11 and -- you know, they're the ones they are in

12:21:29 12 communication with.  The board reviews the BEDC

12:21:35 13 profile, and then they vote on it, and then a contract

12:21:37 14 would be generated for that kind of thing.

12:21:39 15          MR. NICOLAS:  Okay.

12:21:40 16          MR. JANIS:  If that helps.

12:21:41 17          MR. NICOLAS:  That does.  That's fine.

12:21:44 18 Okay.  I'm going to ask for one more break, two

12:21:48 19 minutes.  Let's go off the record.

20          (Brief recess)

12:24:50 21          MR. NICOLAS:  Mr. Benson, thank you very

12:24:50 22 much.  I don't have anything else for you today.

12:24:51 23          MR. JANIS:  I have no questions of this

12:24:52 24 witness.

25          (Deposition concluded)

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366    (956)428-0755    (956)542-1020
(800)462-0253 (STATEWIDE)

```
 1              ARNOLD BENSON - ERRATA SHEET

 2     Reasons for changes:   (1) Clarify the record
                              (2) Conform to the facts
 3                            (3) Correct transcription errors

 4     PAGE LINE   CHANGE FROM/CHANGE TO              REASON

 5     ____ ____   _____       ____

 6     ____ ____   _____       ____

 7     ____ ____   _____       ____

 8     ____ ____   _____       ____

 9     ____ ____   _____       ____

10     ____ ____   _____       ____

11     ____ ____   _____       ____

12     ____ ____   _____       ____

13     ____ ____   _____       ____

14     ____ ____   _____       ____

15     ____ ____   _____       ____

16     ____ ____   _____       ____

17     ____ ____   _____       ____

18     ____ ____   _____       ____

19     ____ ____   _____       ____

20     ____ ____   _____       ____

21     ____ ____   _____       ____

22     ____ ____   _____       ____

23     ____ ____   _____       ____

24

25                        ARNOLD BENSON
```

1           SIGNATURE OF ARNOLD BENSON

2      I have read the foregoing transcript of my

3   deposition and it is a true and accurate record of my

4   testimony given on NOVEMBER 19, 2004, except as to any

5   corrections I have listed on page 52 herein.

6                                    _____

7                                    ARNOLD BENSON

8

9   THE STATE OF TEXAS

10  COUNTY OF CAMERON

11           SUBSCRIBED AND SWORN TO BEFORE ME, the

12  undersigned authority on this the _____ day of

13  _____, 2004.

14

15                          _____

16                          Notary Public in and for
                            The State of Texas

17  My commission expires:

18  _____

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
    GREATER BROWNSVILLE        ) (
 3  INCENTIVES CORPORATION     ) (
           Plaintiff           ) (
 4                             ) (
    VS.                        ) (   CIVIL ACTION NO. B-03-224
 5                             ) (
    TITAN INTERNATIONAL, INC.  ) (
 6         Defendant           ) (

 7                   REPORTER'S CERTIFICATE

 8      I, Donna McCown, Certified Court Reporter, certify

 9  that the witness, ARNOLD BENSON, was duly sworn by me,

10  and that the deposition is a true and correct record of

11  the testimony given by the witness on NOVEMBER 19,

12  2004; that the deposition was reported by me in

13  stenograph and was subsequently transcribed under my

14  supervision.

15      I FURTHER CERTIFY that I am not a relative,

16  employee, attorney or counsel of any of the parties,

17  nor a relative or employee of such attorney or counsel,

18  nor am I financially interested in the action.

19              WITNESS MY HAND on this the 22ND day of

20  November                 , 2004.

21

22              Donna McCown by Rose
                DONNA McCOWN, CSR NO. 6625
23              Expiration Date: 12/31/05
                Bryant & Stingley, Inc., CRN No. 41
24              2010 East Harrison
                Harlingen, Texas  78550
25
```

# STIPULATIONS

Deposition(s) of: _____

Style: _Greater Brownsville Incentives Corp vs Titan International Inc_

Cause No.: _B-03-224_    Date: _11/9_    Trial Date: _____

1. This deposition is taken pursuant to:
   - X A. Notice
   - ___ B. Notice and Subpoena
   - ___ C. Agreement
   - ___ D. Court Order

2. Objections:
   - X A. Objections will be made pursuant to the ~~Texas~~ _Federal_ Federal Rules of Civil Procedure.
   - ___ B. All objections are reserved.
   - ___ C. All objections will be made at the time of taking the deposition.
   - ___ D. An objection made by one defendant is good for all.

3. Signature and Delivery:
   - X A. The original transcript will be sent to _Mr. Nicolas_, the Custodial Attorney, and the original signature page, along with a copy of the transcript(s), will be submitted to ___ the witness or _X_ the witness' attorney, who will return the executed signature page, including any changes, to Bryant & Stingley, Inc., within _____ days of transmittal.
   - ___ B. Signature is waived and the reporter will deliver the original transcript and exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the following:

1. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)  Video Sync___ DVD___ CD___ VHS___

   RUSH / EXPEDITED: Yes _X_ No ___ By (Date): _11/22/04 by noon_

   E-mail Address: _nicolasOmrodriguez.com_

   Signature: _____    Representing: _Titan_

2. Copy of Transcript: Yes _✓_ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)  Video Sync___ DVD___ CD___ VHS___

   RUSH / EXPEDITED: Yes ___ No ___ By (Date): _____

   E-mail Address: _____

   Signature: _____    Representing: _GBIC_

3. Copy of Transcript: Yes___ No ___    Video: (If Applicable) Yes ___ No ___
   (ASCII Disk and Condensed Transcript included)  Video Sync___ DVD___ CD___ VHS___

   RUSH / EXPEDITED: Yes ___ No ___ By (Date): _____

   E-mail Address: _____

   Signature: _____    Representing: _____

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| GREATER BROWNSVILLE INCENTIVES | § | |
| CORPORATION, | § | |
| Plaintiff | § | |
| VS. | § | CIVIL ACTION NO. B-03-224 |
| | § | |
| | § | |
| TITAN INTERNATIONAL, INC., | § | |
| Defendant | § | |

**DEFEENDANTS' NOTICE OF INTENTION TO TAKE THE ORAL
DEPOSITION OF JASON C. HILTS & ARNOLD BENSON**

**TO:** **JASON C. HILTS & ARNOLD BENSON,** by and through their Attorney of
Record, Mr. Brian G. Janis, SANCHEZ, WHITTINGTON, JANIS &
ZABARTE, 100 North Expressway 83, Brownsville, Texas 78521.

Pursuant to the Federal Rules of Civil Procedure, please take notice that

Defendants in the above-styled and numbered cause will take the oral deposition of

**JASON C. HILTS,** at 8:30 o'clock, **a.m.** and **ARNOLD BENSON,** at 10:30 o'clock,

**a.m.** on **Friday, November 19, 2004** at the Law Office of Brian G. Janis, 100 North

Expressway 83, Brownsville, Texas, 78521.

Jason C. Hilts & Arnold Benson shall appear before a certified court reporter at

the place stated above for the purpose of giving their testimony.

Respectfully submitted,

**RODRIGUEZ & NICOLAS, L.L.P.**
319 E. Elizabeth Street
Brownsville, Texas 78520
(956) 574-9333 telephone
(956)574-9337 facsimile

By: _Michael Rodriguez w/psu, f._
Michael Rodriguez

Benson

EXHIBIT NO. 1

Bryant & Stingley, Inc.

State Bar No. 00791553
Federal I.D. No. 18759
Henri E. Nicolas, Jr.
State Bar No. 24014808
Federal I.D. No. 26052
**ATTORNEYS FOR
DEFENDANT TITAN
INTERNATIONAL, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record as set forth below by regular US mail, and facsimile, in compliance with the Federal Rules of Civil Procedure on this 16th day of November, 2004.

**Via Regular Mail and Facsimile**

Brian G. Janis
SANCHEZ, WHITTINGTON, JANIS & ZABARTE
100 North Expressway 83
Brownsville, Texas 78521-2284
Phone (956) 546-3731
Facsimile (956) 546-3766

Henri E. Nicolas, Jr.

THE STATE OF TEXAS                    §
                                      §
COUNTY OF CAMERON                     §

## PROJECT AGREEMENT

THIS Project Agreement is made this 27th day of February, 1997 in Brownsville, Cameron County, Texas, between the GREATER BROWNSVILLE INCENTIVES CORPORATION, a Texas non-profit corporation established pursuant to Article 5190.6 of the Texas Revised Civil Statutes, having a principal place of business at 1 Market Square, Brownsville, Cameron County, Texas 78522, and TITAN WHEEL INTERNATIONAL, INC., an Illinois business corporation, having a principal place of business at 2701 Spruce Street, Quincy, Adams County, Illinois 62301, regarding funding for the establishment of a tire manufacturing operation in Brownsville, as follows:

### I.

### Use Of Funds

The proceeds provided by this Agreement are to be used by TITAN WHEEL INTERNATIONAL, INC. "to enable the initiation of a tire manufacturing operation in or near Brownsville, and to enhance economic development and create jobs thereby," to be itemized in the schedules or plans for same to be provided to the GREATER BROWNSVILLE INCENTIVES CORPORATION, which Project is to be funded in part by the foregoing proceeds (the said funds having been "leveraged" to obtain additional funding for same).

### II.

### Disbursement Of Funds

Such funds will be disbursed in accordance with the following provisions. Assuming compliance with the terms of this Agreement by TITAN WHEEL INTERNATIONAL, INC., such that TITAN WHEEL INTERNATIONAL, INC., is required to create 500 "new jobs" (375 during the first year after construction of the facility for the "Project," 75 during the second year thereafter and 50 during the third year thereafter) over the term of this Agreement (as a condition to funding hereunder), the GREATER BROWNSVILLE INCENTIVES CORPORATION shall pay to TITAN WHEEL INTERNATIONAL, INC., the following:

A - As a "Site Development Credit," the sum of $1,000,000.00, to be paid not in cash but in the form of a grant of a site (of



Benson

EXHIBIT NO. 2

Bryant & Stingley, Inc.

real property, up to 200 acres) north of Brownsville for use as a facility for this "project" (the "plant" for TITAN), such land to be acquired (at a closing to be conducted in the near future) by the GREATER BROWNSVILLE INCENTIVES CORPORATION, constituting part of the "site improvement expense" of TITAN WHEEL INTERNATIONAL, INC., at its new Brownsville area facility, as defined by guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, incurred at the said Brownsville facility (as limited above);

B – As a "Site Development Credit," the sum of $1,000,000.00, paid sixty (60) days after presentation of the relevant invoices, reflecting the amount which is ONE-HUNDRED PER CENT (100%) of the (non-land acquisition) "site improvement expense" for TITAN WHEEL INTERNATIONAL, INC., as defined by the guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, incurred at the new Brownsville facility of TITAN WHEEL INTERNATIONAL, INC. (as limited above);

C – As an additional "Site Development Credit," the sum of $460,001.00, paid sixty (60) days after presentation of the relevant invoices, reflecting the amount which is ONE-HUNDRED PER CENT (100%) of additional (non-land acquisition) "site improvement expenses" for TITAN WHEEL INTERNATIONAL, INC., as defined by the guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, for (1) a 1/4 mile access road, and (2) a facility parking lot, incurred at the new Brownsville facility of TITAN WHEEL INTERNATIONAL, INC. (as limited above), it being provided, however, that the sum of $692,862.00 will be paid directly to the Public Utilities Board (i.e., through the City Of Brownsville) for miscellaneous "site improvement expenses" for TITAN WHEEL INTERNATIONAL, INC., as defined by the guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, for (1) extending water/sewer lines to the site, (2) the purchase of water rights, and (3) acreage charges, which is subject to reimbursement (to GBIC) on receipt of funds from pending grant applications under the auspices of the CITY OF BROWNSVILLE (with the U.S. Economic Development Administration);

D – As yet an additional (and final) "Site Development Credit," the sum of $680,000.00 (or if less, the maximum cost of 240,000 cubic yards of dirt, as explained below), paid sixty (60) days after presentation of the relevant invoices, reflecting the amount which is ONE-HUNDRED PER CENT (100%) of additional (non-land acquisition) "site improvement expenses" for TITAN WHEEL INTERNATIONAL, INC., as defined by the guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION,

PROJECT AGREEMENT - PAGE 2

for acquiring fill dirt (the local provider of which is to be identified publicly) to elevate the ground level and to provide a sufficient base for the construction of the buildings and improvements required for the contemplated manufacturing operation of TITAN WHEEL INTERNATIONAL, INC., in or near Brownsville, Texas (as limited above), noting further that the sum of $300,000.00 of the aforesaid sums (i.e., the "site development expenses" payable to TITAN hereunder) is to be paid, instead, to the CITY OF BROWNSVILLE for the "EDA Jose Escandon Road Project," which project is being funded by the CITY for the benefit of TITAN and is to involve some reimbursement or payment from the U.S. Economic Development Administration, and that TITAN must first expend its (own) budgeted funds ($50,000.00) for such fill dirt (and invoices for same must be provided to GBIC) before any of the said funds above (in this sub-paragraph) are expended, and moreover, while GBIC will pay for such fill dirt, it (and the CITY) is not responsible for problems or disputes involving quantity, quality, time of service or method of delivery, or the delivery (to the extent possible, the providers of fill dirt should be from Brownsville or its extraterritorial jurisdiction, for which TITAN will submit a signed contract for same, along with proof of all necessary permits for the site and a Texas Department Of Transportation [required] Traffic Control Plan);

E - As a "Lease/Building Assistance Credit," the sum of $1,712,500.00, paid pro-rata (i.e., annually) over the three years of this Agreement referred to above, after construction of the said facility for the "Project," (i.e., $687,500.00, $737,500.00 and $287,500.00), reflecting the "lease expense" (or the equivalent of such expense to construct a building for manufacturing use) for facilities of TITAN WHEEL INTERNATIONAL, INC. (i.e., 50%, 35% and 20%), as defined by guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, incurred at the new Brownsville facility of TITAN WHEEL INTERNATIONAL, INC. (as limited above), during the said term of this Agreement, subject to the right to carryover funds not used in the first or second years to the third year; and

F - As a "Job Creation Credit," the sum of $975,000.00, paid pro-rata (i.e., annually), in the sum of $780,000.00, $117,000.00 and $78,000.00, reflecting the amount which is TEN (10%) PER CENT of the "annual non-principal wages" of TITAN WHEEL INTERNATIONAL, INC., as defined by guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, incurred at the new Brownsville facility of TITAN WHEEL INTERNATIONAL, INC. (as

PROJECT AGREEMENT - PAGE 3

limited above), during the said three (3) years of this Agreement.

The maximum amount of reimbursement is not to exceed (for all credits hereunder) $13,040.73 per "new job created" at TITAN WHEEL INTERNATIONAL, INC. (in or near Brownsville, Texas only), during the term of this Agreement, in accordance with guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION, provided that the GREATER BROWNSVILLE INCENTIVES CORPORATION has first verified and approved the amount of the "site improvement expenses," the "lease/building expense" and the "annual non-principal wages," and the "new jobs created" are valid, continuous and in force for at least ninety (90) days -- as determined at the close of the second quarter of the relevant year -- which amounts are not to exceed the sum of $1,000,000.00, $1,000,000.00, $460,001.00 (noting that $692,862.00 will be paid directly to the Public Utilities Board, by and through the City Of Brownsville), $680,000.00 (or if less, the cost of 240,000 cubic yards of dirt), $1,712,500.00 and $975,000.00, respectively, over the term of this Agreement (i.e., five years).'

The parties agree that in the event that TITAN WHEEL INTERNATIONAL, INC., discontinues operations or is dissolved or liquidated or no longer maintains a tire manufacturing operation in or near Brownsville, or if TITAN WHEEL INTERNATIONAL, INC., does not commence such construction within eleven (11) months, does not commence hiring and training for the plant within ten (10) months (involving Spend Skills Development Training dollars, which must be spent in Brownsville), or does not commence operations within two (2) years in or near Brownsville, from the date of execution of this Project Agreement (February 27, 1997), any properties or assets held by TITAN WHEEL INTERNATIONAL, INC., which were acquired with funds, in whole or in part (including such funds), provided by the GREATER BROWNSVILLE INCENTIVES CORPORATION, shall revert to that CORPORATION (subject to any superior liens); to this extent, any properties or assets acquired by TITAN WHEEL INTERNATIONAL, INC., with funds, in whole or in part, provided by the GREATER BROWNSVILLE INCENTIVES CORPORATION shall not be alienated, conveyed or transferred from TITAN WHEEL INTERNATIONAL, INC., without the prior authorization of the GREATER BROWNSVILLE INCENTIVES CORPORATION (except in the ordinary course of business), and, to avoid commingling or problems with tracing such funds, TITAN WHEEL INTERNATIONAL, INC., shall segregate, for accounting and other similar purposes, all funds (and properties) received from the GREATER BROWNSVILLE INCENTIVES CORPORATION and from other sources.

PROJECT AGREEMENT - PAGE 4

III.

## Consideration

In consideration of the establishment of a tire manufacturing operation in or near Brownsville, Cameron County, Texas, pursuant to this Agreement, which will create jobs, facilitate commerce and trade and improve the economic infrastructure and labor force of the area, thus enhancing economic development, the stated goal of the GREATER BROWNSVILLE INCENTIVES CORPORATION, said entity will finance, for the benefit of TITAN WHEEL INTERNATIONAL, INC., the said "Site Development Credits," "Lease/Building Assistance Credit" and "Job Creation Credit," to enable the initiation of a tire manufacturing operation in or near Brownsville, funding part of the "cost" of a "project" for economic development thereby, as such terms are described and defined in Article 5190.6 of the Texas Revised Civil Statutes, the said CORPORATION's authorizing legislation, same having been found by the said CORPORATION's Board Of Directors "to be required or suitable for the promotion of development and expansion of manufacturing and industrial facilities, ... distribution centers [etc.] ... ."

The foregoing credits are supplemented by other incentives provided by the State Of Texas and other entities, as reflected by the listing annexed hereto as Exhibit "A" and incorporated by reference herein (the total amount of incentives including the said credits), it being understood by the parties to this Project Agreement that the GREATER BROWNSVILLE INCENTIVES CORPORATION (and by extension, the CITY OF BROWNSVILLE) does not control the provision of such incentives (by the State Of Texas and other entities) and has no responsibility for the provision of same, as reflected by Paragraph XV. (and other provisions) of this Project Agreement.

IV.

## Performance Of Agreement

In providing a tire manufacturing operation in or near Brownsville, TITAN WHEEL INTERNATIONAL, INC., acting by and through its respective agents, will conduct itself in conformity with the requirements and standards of the GREATER BROWNSVILLE INCENTIVES CORPORATION. To this extent, TITAN WHEEL INTERNATIONAL, INC., will perform all acts necessary to successfully fulfill the purpose of this Agreement and shall, at all times, faithfully, industriously and to the best of its abilities, experience and talents, perform all the duties that may be required of and from it pursuant to the express and implicit terms hereof and to the reasonable satisfaction of the GREATER BROWNSVILLE INCENTIVES CORPORATION.

PROJECT AGREEMENT - PAGE 5

In a manner calculated to achieve the goals of the GREATER BROWNSVILLE INCENTIVES CORPORATION in enhancing economic development and to maximize the value of the said CORPORATION's investments in various economic development projects, pursuant to the policies set by the CORPORATION's Board Of Directors from time to time, TITAN WHEEL INTERNATIONAL, INC., shall keep the said CORPORATION apprised of the status of the said Project, to insure compliance with this Agreement. To this extent, on a quarterly basis, TITAN WHEEL INTERNATIONAL, INC., shall prepare and send to the GREATER BROWNSVILLE INCENTIVES CORPORATION, by and through its Board Of Directors, a report showing the activities conducted pursuant to this Agreement during the preceding quarter and setting forth an accounting of funds received and expended pursuant to this Agreement during the preceding quarter, with each such report showing the cumulative expenses and revenues for the preceding quarter together with all prior quarters during the term of this Agreement, as well as "employment levels" for all such quarters.

TITAN WHEEL INTERNATIONAL, INC., shall have a "review" audit of all funds and activities of this Project prepared annually by a Certified Public Accountant (which auditor may be employed by the company), a copy of which shall be presented to the GREATER BROWNSVILLE INCENTIVES CORPORATION within ninety (90) days of the close of the said company's fiscal year, and further, the said company will provide a copy of its proposed and adopted budgets regarding this Project to the GREATER BROWNSVILLE INCENTIVES CORPORATION as soon as same can be (reasonably) forwarded to the CORPORATION. Additionally, the said company will make available for inspection, at a reasonable time and place, at the request of the CORPORATION, any or all of the said company's financial and payroll records as same relates to this Project, provided however, that all of such records will be deemed "confidential" and not released to third parties (pursuant to the Texas Open Records Act).

V.

## Term Of Agreement

The term of this Agreement shall be five (5) years, commencing November 1, 1996 and ending October 31, 2001.

VI.

## Termination

This Agreement may be terminated for cause (including the failure to comply with the requirements or standards of the GREATER BROWNSVILLE INCENTIVES CORPORATION, or any action constituting a

PROJECT AGREEMENT - PAGE 6

breach of the terms of this Agreement) by either party, as appropriate, or by mutual agreement of the parties, or in the event of any occurrence (e.g., bankruptcy, dissolution or governmental action, as appropriate) precluding either party from performing the obligations contemplated under this Agreement. In the event of the termination of this Agreement for any reason prior to the expiration of the term of this Agreement, the parties shall be entitled to all compensation earned by them through the effective date of termination, as appropriate, and any remedies available at law or in equity, which rights and remedies shall survive the termination of this Agreement.

VII.

<u>Indemnity</u>

TITAN WHEEL INTERNATIONAL, INC., shall indemnify, protect and hold harmless the GREATER BROWNSVILLE INCENTIVES CORPORATION, its directors, affiliates, officers, agents, employees, representatives, successors, assigns and insurers, from any and all liabilities, claims, demands, actions, losses, damages and costs, including all costs of defense thereof, of any nature whatsoever, for injury to or death of persons or loss or damage to property, or for any other reason, including economic or environmental loss of any kind, in any manner arising out of or connected with the performance of TITAN WHEEL INTERNATIONAL, INC., under this Agreement, or arising out of the execution of or performance (or non-performance) of this Agreement, and including claims and actions based upon the acts or omissions of TITAN WHEEL INTERNATIONAL, INC., or its shareholders, directors, officers, agents, employees, representatives, parents, subsidiaries, affiliates, related holding companies, successors, assigns and insurers.

Upon demand, TITAN WHEEL INTERNATIONAL, INC., shall, at its own expense, defend the GREATER BROWNSVILLE INCENTIVES CORPORATION, its directors, affiliates, officers, agents, employees, representatives, successors, assigns and insurers, against any and all such liabilities, claims, demands, actions, losses, damages and costs. Moreover, TITAN WHEEL INTERNATIONAL, INC., shall give the GREATER BROWNSVILLE INCENTIVES CORPORATION prompt notice of any claim within its knowledge that in any way, directly or indirectly, affects either party. Both parties shall have the right to participate in the defense of such claim to the extent of their interests.

PROJECT AGREEMENT - PAGE 7

VIII.

<u>Insurance</u>

Both parties agree to obtain insurance (to the extent available) in the type and amount deemed advisable to protect their respective interests. To this extent, the parties agree to provide insurance for their respective conveyances, equipment, facilities and instrumentalities, as appropriate.

IX.

<u>Status Of Parties</u>

The parties hereto shall not be construed to have the relationship of partners, joint venturers, principal-agent or employer-employee. The parties hereto are separate entities who enter into this Agreement for their respective benefit.

X.

<u>Compliance With Law</u>

The parties will act, at all times, in compliance with all pertinent and applicable laws.

XI.

<u>Entire Agreement</u>

This Agreement contains the entire agreement between the parties relating to the rights herein granted and the obligations herein assumed, and supersedes any prior understandings, representations, memorandums or agreements regarding the service relationship that is the subject of this Agreement. Any oral representations or modifications concerning this instrument shall be of no force or effect. This Agreement may be amended, provided that no amendment, modification or alteration of the terms of this Agreement shall be binding unless the same is in writing and duly executed by the parties hereto.

XII.

<u>Law Governing; Venue</u>

This Agreement shall be governed by and construed in accordance with the laws of the State Of Texas (and where applicable, the laws of the United States Of America), and, the

PROJECT AGREEMENT - PAGE 8

obligations and undertakings of each of the parties to this Agreement shall be performable in Cameron County, Texas.

## XIII.

### <u>No Waiver</u>

Any waiver by any party of any default under or breach of this Agreement shall not be construed as a continuing waiver of such default or breach, nor as a waiver of or permission for (express or implied) any other or subsequent default or breach.

## XIV.

### <u>No Assignment</u>

This Agreement shall not be assigned in whole or in part by either party without the consent and approval of the other party, set forth in writing and signed by both parties. Any assignee will be bound by the terms of this Agreement.

## XV.

### <u>No Warranties Or Representations</u>

The parties to this Agreement specifically acknowledge that the GREATER BROWNSVILLE INCENTIVES CORPORATION (or by extension, the CITY OF BROWNSVILLE) shall not be obligated to pay any funds to TITAN WHEEL INTERNATIONAL, INC., beyond the (contingent) payments contemplated by this Agreement, as set forth above, which are not to exceed the sum that is: $1,000,000.00, $1,000,000.00, $460,001.00 or $680,000.00 (as set forth above) for the "site improvement expenses," $1,712,500.00 for the "lease/building expense" and $975,000.00 for the "annual non-principal wages" of TITAN WHEEL INTERNATIONAL, INC., and/or the sum representing $13,040.73 per "new job created," in accordance with guidelines of the GREATER BROWNSVILLE INCENTIVES CORPORATION -- for the "Site Development Credits" (not to exceed the sum of $1,000,000.00, $1,000,000.00, $460,001.00 or $680,000.00, as set forth above), for the "Lease Assistance Credit" (not to exceed the sum of $1,712,500.00), and for the "Job Creation Credit" (not to exceed the sum of $975,000.00).

NO WARRANTY OR REPRESENTATION OF ADDITIONAL PAYMENTS OR FUNDING OR CREDIT OR THE EXTENSION OF CREDIT HAS BEEN MADE, IS BEING MADE OR WILL BE MADE BY THE GREATER BROWNSVILLE INCENTIVES CORPORATION (OR THE CITY OF BROWNSVILLE). FURTHERMORE, NO WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER IS BEING MADE BY THE

PROJECT AGREEMENT - PAGE 9

GREATER BROWNSVILLE INCENTIVES CORPORATION OR TITAN WHEEL INTERNATIONAL, INC., IN CONNECTION WITH THE EXECUTION OR PERFORMANCE OF THIS AGREEMENT, except to the extent set forth in this instrument.

## XVI.

### Parties Bound

This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, legal representatives, successors and assigns, as appropriate.

## XVII.

### Notices

Any notice to either party shall be sent by certified or registered mail, addressed to the parties as set forth above, at their respective addresses set forth above or such other address as may be designated.

## XVIII.

### Invalidity

If any term, provision, covenant or condition of this Agreement is held by a tribunal of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Moreover, it is the intention of the parties to this Agreement that in lieu of each clause or provision of this Agreement that is held to be invalid, void or unenforceable, there be added as a part of this Agreement a clause or provision as similar in terms to such invalid, void or unenforceable clause or provision as may be feasible which shall nevertheless be valid, legal and enforceable.

## XIX.

### Arbitration

ANY DISPUTE, CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR INVALIDITY THEREOF, SHALL BE SETTLED BY ARBITRATION IN ACCORDANCE WITH THE FEDERAL ARBITRATION ACT AND THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION, USING ONE ARBITRATOR -- SUCH ARBITRATION TO BE CONDUCTED IN BROWNSVILLE, CAMERON COUNTY, TEXAS,

PROJECT AGREEMENT - PAGE 10

IN THE ENGLISH LANGUAGE -- AND A JUDGMENT UPON THE AWARD RENDERED
BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION
THEREOF.

XX.

## Attorney Fees

If any proceeding is initiated to resolve a dispute arising
under or relating to this Agreement by either of the parties
hereto, it is expressly agreed that the prevailing party shall be
entitled to recover from the other party reasonable attorney fees
and expenses in addition to any other relief that may be awarded.

XXI.

## Construction Of Instrument

Each of the parties hereto have been represented by the
attorneys of their choice in the negotiation and drafting of this
Agreement. Accordingly, this Agreement shall not be construed in
favor of either party.

XXII.

## Authority

The parties to this Agreement, to-wit, TITAN WHEEL
INTERNATIONAL, INC., and the GREATER BROWNSVILLE INCENTIVES
CORPORATION, specifically warrant and represent that the
signatories below are authorized to act on behalf of the respective
party to this instrument, that the signatories have been
specifically authorized to execute this Project Agreement by said
parties in accordance with the requisite corporate formalities of
each such party, that the execution of this instrument by said
signatories constitutes the binding act of each such party to this
instrument and that the execution of this instrument and the
adoption of same by each party is authorized by law.

EXECUTED in duplicate (as revised) on the ___7th___ day of
November, 1997 at Brownsville, Cameron County, Texas.

GREATER BROWNSVILLE INCENTIVES
CORPORATION

BY: _____
Eduardo R. Rodriguez, President

PROJECT AGREEMENT - PAGE 11

ATTEST:

_____
Irv Downing, Secretary


TITAN WHEEL INTERNATIONAL, INC.


BY: _____
Gary Carlson, Vice-President


ATTEST:

_____
Name: _____
Title: _____


PROJECT AGREEMENT - PAGE 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

GREATER BROWNSVILLE INCENTIVES § CIVIL ACTION
CORPORATION, §
    Plaintiff §
        §
VS. § NO. B-03-224
        §
TITAN INTERNATIONAL, INC., §
    Defendant §

### AFFIDAVIT OF ARNOLD BENSON

THE STATE OF TEXAS  §
         §
COUNTY OF CAMERON  §

  BEFORE ME, the undersigned authority, on this day personally appeared ARNOLD BENSON, known to me, and being by me duly sworn, deposed and said on his oath that:

1 - I am of the age of majority, of sound mind and capable of making this Affidavit.

2 - I am personally acquainted with the facts stated in this Affidavit.

3 - I submit this Affidavit in support of the foregoing Motion For Summary Judgment filed in this action on behalf of GREATER BROWNSVILLE INCENTIVES CORPORATION (GBIC).

4 - At all material times, I was (and am) the President of the GREATER BROWNSVILLE INCENTIVES CORPORATION, a Texas economic development corporation, hereinafter referred to as "GBIC," which expends public funds it receives (from city sales taxes) for economic development purposes (and projects), and I am authorized to act on behalf of GBIC in this matter.

5 - GBIC filed a suit for declaratory relief (only) in state district court regarding a certain (economic development) Project Agreement (contract) with and a related Deed to Defendant, TITAN INTERNATIONAL, INC., hereinafter referred to as "TITAN," previously known as "TITAN WHEEL INTERNATIONAL, INC.," as set forth in Plaintiff's Original Petition filed in

AFFIDAVIT OF ARNOLD BENSON - PAGE 1


*Benson*
EXHIBIT NO. 3
Bryant & Stingley, Inc.

the 107th Judicial District Court of Cameron County, Texas, and docketed as Cause No. 2003-11-5493-A (having the same style as set forth in the caption above).

6 - As set forth in detail in that Petition; and in the foregoing Motion For Summary Judgment, the GBIC is an economic development corporation created under Texas (statutory) law that enters into project agreements with various business concerns, almost always to create jobs, in consideration for certain incentives (such as building/lease assistance and/or site development funding).

7 - In this instance, GBIC and TITAN entered into a Project Agreement, which involved the funding of millions of dollars for the establishment by TITAN of a tire manufacturing operation in or near Brownsville, which was anticipated to enhance economic development and to create 500 jobs; a copy of the Project Agreement was filed with the Court as Exhibit 2 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment.

8 - A large part of the funds paid for by GBIC was for the purchase of the land -- as reflected by a Special Warranty Deed from GBIC, a copy of which was filed with the Court as Exhibit 4 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment, conveying the land to TITAN, pursuant to the Project Agreement -- and site improvements and/or construction of the facility to operate the tire manufacturing plant of TITAN in Brownsville.

9 - However, TITAN created no more that 122 jobs at the Brownsville facility, resulting in an overpayment by GBIC, and a claim letter being submitted to TITAN by GBIC, a copy of which was filed with the Court as Exhibit 1 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment, advising TITAN of the situation.

10 - As part of the Project Agreement, particularly Subparagraph A. of Paragraph II., one of the incentives to be paid to TITAN by GBIC was a "Site Development Credit" in the sum of $1,000,000.00, which was not paid in cash as such but in the form of a grant (i.e., conveyance) of a site to locate the facility needed for this project.

11 - This site (land), of up to two-hundred acres north of Brownsville, to locate the facility for this project (the

AFFIDAVIT OF ARNOLD BENSON - PAGE 2

"plant" of TITAN) in or near Brownsville, was acquired (i.e., paid for) by GBIC as a "site improvement expense."

12 - Subsequently, a Special Warranty Deed (Exhibit 4), dated November 14, 1996, was executed by GBIC in favor of TITAN, with an effective date of February 28, 1997, pursuant to the said Project Agreement.

13 - The Deed indicates that the consideration given "is in accordance with [the] Project Agreement by and between [the] Grantor and Grantee" (i.e., GBIC and TITAN), and involved the conveyance of 192 acres (more or less), to provide a site for the construction and operation of the said tire manufacturing facility (of TITAN) in or near Brownsville.

14 - Under the Project Agreement, which explicitly refers to a conveyance of land by GBIC for the use of TITAN, as evidenced by the Special Warranty Deed, the land was granted, sold and conveyed to TITAN by GBIC. However, this conveyance is subject to other provisions of the said Project Agreement, such as the third (unnumbered) subparagraph of Paragraph II. (entitled "Disbursement Of Funds"), at Page 4 of the Agreement.

15 - As set forth in the Petition, the Motion For Summary Judgment and the Project Agreement itself (at Paragraph II., as referred to in Paragraph 14 above), there is a provision in that contract that was agreed to by the parties, to the effect that if TITAN discontinued its "operations or ... no longer maintains a -tire manufacturing operation in or near Brownsville ..." at any time after the execution of the "Agreement (February 27, 1997), any properties or assets held by TITAN ... acquired with funds, in whole or in part (including such funds), provided by" GBIC, "shall revert" to GBIC.

16 - According to information received by GBIC, including but not limited to a press release to this effect, a copy of which (the press release) was filed with the Court as Exhibit 3 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment, TITAN publicly announced that its tire manufacturing operation in Brownsville would be consolidated (with all of its tire manufacturing operations) into its principal tire facility located in Des Moines, Iowa.

17 - This press release was augmented by a recent advertisement that appeared in The Brownsville Herald reflecting that "limited quantities" of tires could be purchased, as part of

AFFIDAVIT OF ARNOLD BENSON - PAGE 3

a "year end inventory liquidation," at the TITAN facility in Brownsville, a copy of which (the advertisement) was filed with the Court as Exhibit 5 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment.

18 - As such, TITAN <u>discontinued</u> its operations in Brownsville and "no longer maintains a tire manufacturing operation in or near Brownsville" (as is set forth in the provision above [referred to in Paragraph 15]).

19 - Thus, two of the reasons (or contingencies) to invoke the said provision (in Paragraph II. of the Project Agreement) have occurred, and therefore the land conveyed by GBIC to TITAN (subject to the said condition), and the improvements thereon (to the extent same has also been financed by GBIC), has <u>reverted</u> to GBIC, under and pursuant to the Project Agreement.

20 - Therefore, GBIC, as set forth in the said claim letter, invoked the reversion clause and sought the return of the land (which "shall revert," according to that clause) it purchased for TITAN and that portion of the improvements thereon paid for by GBIC.

21 - In that TITAN did not respond to the said claim letter by acknowledging the reversion clause or that the reversion clause was activated by TITAN's action to discontinue its operations in Brownsville, it became apparent that TITAN was not going to honor its obligation to GBIC under the Project Agreement (under that clause), necessitating the judicial enforcement of the reversion clause, to confirm the reversion of the land and improvements, resulting in a suit for declaratory relief being filed, seeking that relief, in addition to costs of court and attorney fees.

22 - In filing this case, the only issue is the matter of the reversion of the land and the improvements thereon, under the Project Agreement, according to the directives of the Board Of Directors of GBIC (the debt claim, as regards the said overpayment, and other matters are <u>not</u> at issue in this case).

23 - Thus, GBIC filed suit to obtain a judicial declaration that under the Project Agreement (and related Special Warranty Deed), by virtue of TITAN removing its operations from Brownsville, such that it is no longer operating in Brownsville and no longer maintains a tire manufacturing operation in or near Brownsville, the land and improvements

AFFIDAVIT OF ARNOLD BENSON - PAGE 4

a "year end inventory liquidation," at the TITAN facility in Brownsville, a copy of which (the advertisement) was filed with the Court as Exhibit 5 of Plaintiff's Exhibits In Support Of Its Motion For Summary Judgment.

18 - As such, TITAN discontinued its operations in Brownsville and "no longer maintains a tire manufacturing operation in or near Brownsville" (as is set forth in the provision above [referred to in Paragraph 15]).

19 - Thus, two of the reasons (or contingencies) to invoke the said provision (in Paragraph II. of the Project Agreement) have occurred, and therefore the land conveyed by GBIC to TITAN (subject to the said condition), and the improvements thereon (to the extent same has also been financed by GBIC), has reverted to GBIC, under and pursuant to the Project Agreement.

20 - Therefore, GBIC, as set forth in the said claim letter, invoked the reversion clause and sought the return of the land (which "shall revert," according to that clause) it purchased for TITAN and that portion of the improvements thereon paid for by GBIC.

21 - In that TITAN did not respond to the said claim letter by acknowledging the reversion clause or that the reversion clause was activated by TITAN's action to discontinue its operations in Brownsville, it became apparent that TITAN was not going to honor its obligation to GBIC under the Project Agreement (under that clause), necessitating the judicial enforcement of the reversion clause, to confirm the reversion of the land and improvements, resulting in a suit for declaratory relief being filed, seeking that relief, in addition to costs of court and attorney fees.

22 - In filing this case, the only issue is the matter of the reversion of the land and the improvements thereon, under the Project Agreement, according to the directives of the Board Of Directors of GBIC (the debt claim, as regards the said overpayment, and other matters are not at issue in this case).

23 - Thus, GBIC filed suit to obtain a judicial declaration that under the Project Agreement (and related Special Warranty Deed), by virtue of TITAN removing its operations from Brownsville, such that it is no longer operating in Brownsville and no longer maintains a tire manufacturing operation in or near Brownsville, the land and improvements

AFFIDAVIT OF ARNOLD BENSON - PAGE 4

thereon (as indicated above), as purchased through funds of GBIC, reverted to GBIC.

24 - As I understand this case, it only deals with the matter of the property and the title to same, under the reversion provision referred to above (in the Project Agreement), and I have been advised that the effort to enforce the contract (specifically the reversion clause), to require or mandate a transfer of land and the improvements on the land (judicially), is very similar to a suit for injunction or what has been referred to as "specific performance" of a contract.

25 - Throughout this Affidavit, reference has been made to certain documents, to-wit, a claim letter of GBIC, a Project Agreement, a news release of TITAN, a Special Warranty Deed and an advertisement published by TITAN (the said Exhibits 1-5), which are records of regularly conducted activity of GBIC (and some are recorded instruments as well); to this extent, I hereby aver that I am a custodian of all such records of GBIC, as referenced above and throughout this Affidavit, a copy or original of which (depending on the document) has been kept by me in the regular course of business (of an economic development corporation), it being in the regular course of such business for an employee or representative of such business, with knowledge of the act or event recorded, to make the record or to transmit information thereof to be included in such record, any such record having been made or recorded at or near the time of the act or event (recorded) or reasonably soon thereafter, and the foregoing and above-referenced records being the original of same or an exact duplicate of the original.

26 - TITAN has not set forth any basis whatsoever for GBIC's claims in this case not to be enforced and reduced to judgment, regardless of various affirmative defenses asserted, which GBIC contends are groundless, inapplicable or both (for the reasons set forth below).

27 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of waiver/estoppel for the reason that GBIC has not, at any time, knowingly or voluntarily waived any of its rights under the Project Agreement (or at law) to enforce the reversion that is at issue in this case.

28 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of laches for the reason that TITAN discontinued its Brownsville tire manufacturing

AFFIDAVIT OF ARNOLD BENSON - PAGE 5

operation in July of 2003 and suit was filed in November of 2003 (within four months), so it cannot be asserted that GBIC "slept on its rights."

29 - TITAN cannot preclude .GBIC's claims for declaratory and related relief on the basis of an arbitration agreement for the reason that this case does not involve a dispute under the contract (for debt and the like) but involves (only) a judicial confirmation of a right that has already come into existence by the fulfillment of a condition or contingency under that contract, to-wit, a reversion of land and improvements as a result of a failure to continue a tire manufacturing operation in Brownsville, this suit being in the nature of equitable (e.g., injunctive) relief (fundamentally, a matter that can only be resolved by a court).

30 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of GBIC's alleged failure to mitigate damages for the reason that this case does not involve a damage claim; this case is limited to declaratory and related relief.

31 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of GBIC's alleged failure to comply with its duties and obligations under the contract for the reason that GBIC has performed all of its duties under the Project Agreement, and it is TITAN that does not acknowledge its duties under the contract at issue in the only particular at issue in this case, to-wit, the acceptance of the reversion of the land and improvements arising under the contract.

32 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of GBIC's alleged delay in the construction of the tire manufacturing plant for the reason that GBIC has never invoked that item (construction completion) as a basis for a reversion (although that is another basis in the same provision of the contract for such reversion to arise) and GBIC could not, since it was not acting as a contractor, delay the construction, plus GBIC has always acted to expedite the project (the plant) as it was in the mutual interest of the parties to do so (such as adding funds for additional site development credits, at TITAN's request).

33 - TITAN cannot preclude GBIC's claims for declaratory and related relief on the basis of GBIC allegedly failing to provide all incentives promised to TITAN for the reason that

AFFIDAVIT OF ARNOLD BENSON - PAGE 6

this case does not involve a damage claim (this case is
limited to declaratory and related relief), but GBIC awarded
all incentives set forth in the Project Agreement that TITAN
was entitled to receive, in accordance with the Project
Agreement.

34 - TITAN cannot preclude GBIC's claims for declaratory and
related relief on the basis of TITAN complying with the
Project Agreement, which terminated (i.e., expired) prior to
this case being filed, for the reason that this case does not
involve a damage (debt) claim, the only issue in <u>this</u> case is
TITAN complying with the Project Agreement in regard to the
reversion of the land and the improvements (by recognizing and
acknowledging the reversion), and the expiration of a
contract's term does not nullify the terms of the contract --
particularly where there is no time limit on the provision at
issue in the contract.

35 - TITAN cannot preclude GBIC's claims for declaratory and
related relief on the basis of frustration for the reason that
this case does not involve a damage claim and TITAN did <u>not</u>
have to discontinue its Brownsville tire manufacturing
operation: it did so knowingly and voluntarily, thus invoking
(by its own action) the reversion clause of the Project
Agreement.

36 - TITAN cannot preclude GBIC's claims for declaratory and
related relief on the basis of accord and satisfaction, or
satisfaction, for the reason that GBIC has not entered into
any new agreements with TITAN regarding the subject of the
said Project Agreement (or Special Warranty Deed).

37 - TITAN cannot preclude GBIC's claims for declaratory and
related relief on the basis of (statute of) limitations for
the reason that TITAN discontinued its Brownsville tire
manufacturing operation in July of 2003 and this suit was
filed in November of 2003 (within four months), so it cannot
be asserted that GBIC's claim in the instant case is barred by
limitations.

38 - TITAN cannot preclude GBIC's claims for declaratory and
related relief on the basis of "illusory contract" for the
reason that the contract reflected the agreement of the
parties in writing, executed after months of "arm's length"
negotiations and involving sophisticated parties represented
by counsel, supported by substantial consideration as to both

AFFIDAVIT OF ARNOLD BENSON - PAGE 7

parties, including the reversion clause (which was the "basis for the bargain" [at least in part]).

39 - TITAN cannot preclude GBIC's claim for declaratory and related relief on the basis of "failure of condition precedent' for the reason that the Project Agreement does not contain a "condition precedent" provision as such, GBIC performed all of its obligations under the Project Agreement -- in accordance with its terms -- and the condition precedent -- if this refers to the event giving rise to the reversion (the discontinuance of operations at the said tire manufacturing facility and/or the failure to maintain an ongoing tire manufacturing facility in Brownsville) -- did in fact occur.

40 - Accordingly, TITAN has not presented a valid affirmative defense that bars or precludes GBIC's action (its _prima_ _facie_ case) for declaratory and related relief.

FURTHER AFFIANT SAYETH NOT.

ARNOLD BENSON, President
GREATER BROWNSVILLE INCENTIVES
CORPORATION

SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of July, 2004, to certify which witness my hand and official seal.



Notary Public in and for
The State Of Texas

ALMA ROSA CARDENAS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
SEPTEMBER 29, 2006

AFFIDAVIT OF ARNOLD BENSON - PAGE 8